**BOURBEAU v. UNITED STATES et al.**

Civ. No. 467.

District Court, D. Maine, S. D.

Feb. 12, 1948.

Sidney W. Wernick, of Portland, Me., and Benjamin L. Berman, of Lewiston, Me., for plaintiff.

William H. Clifford, of Lewiston, Me., for defendants Fortins.

Alton Lessard, U. S. Atty., of Lewiston, Me., and Edward J. Harrigan, Asst. U. S. Atty., of Portland, Me., for the U. S.

PETERS, District Judge.

The plaintiff seeks to be declared the legal beneficiary of a National Service Life Insurance policy issued to his son who died while serving as a soldier in the last war. The case was heard by the Court without jury.

From stipulations it appears that the soldier, who bore the same name as his father, was born October 13, 1922; entered active Service January 13, 1942; was granted insurance in the amount of $10,000 on March 1, 1943, and died while in the Service on January 18, 1945, with the insurance in force. The only beneficiary designated in the policy was the "Estate" of the insured,—a designation not permit-

ted by the Act,—which, consequently, is to be applied as if no beneficiary had been named.

As the soldier never married and his only surviving parent was his father—the mother having died in 1931—the applicable part of the statute is section 802 (h) (3) (C) of U.S.C.A., Title 38, which provides that the insurance shall be payable in such a case—"(C) if no widow, widower or child, to the parent or parents of the insured · * * *, if living, in equal shares."

The Act, as amended, in its "definitions" provides that "the terms 'parent', 'father', and 'mother' include a father, mother, father through adoption, mother through adoption, persons who have stood in loco parentis to a member of the military or naval forces at any time prior to entry into active service for a period of not less than one year, and a stepparent, if designated as beneficiary by the insured." Sec. 801(f).

Claims for the benefits of the insurance were made both by the plaintiff, the father, and by the defendants, Rose Fortin, an aunt of the soldier, and Alfred Fortin her husband.

The Veterans Administration denied the claim of the father and allowed the claims of the Fortins as persons standing in loco parentis to the soldier for a period of not less than one year prior to his entry into active service.

The only question presented by the parties and the only issue raised in this suit by the father is whether the Fortins stood "in loco parentis" to the soldier, as that term is used in the Act.

Counsel are in disagreement as to the construction of the language used in the statute as well as to the result of its application to the evidence,—counsel for defendants contending that the phrase "in loco parentis" should be liberally construed as a descriptive one and counsel for the plaintiff urging that the words are used in their common-law sense.

The position of counsel for the defendants is supported to some extent by the case of Zazove v. United States et al., 7 Cir., 156 F.2d 24, upon which they rely, but I find myself in agreement with the views of the plaintiff's counsel as supported and·set forth in the opinions in Niewiadomski v. United States, 6 Cir., 159 F.2d 683 and Strauss v. United States, 2 Cir., 160 F.2d 1017.

The Zazove case seems to hold that the words "in loco parentis" as used in the Act, are descriptive words, not to be subjected to the common-law limitations,— while the other two cases hold that the words were used by Congress in their usually accepted common-law sense. As to the Common-law meaning there can be no serious dispute. 32 Words and Phrases, Perm.Ed., page 415, 416, puts it this way: "A person standing 'in loco parentis' to a child is one who has put himself in the situation of a lawful parent by assuming the obligations incident to the parental relation, without going through the formalities necessary to a legal adoption. The assumption of the relation is a question of intention."

That the common-law meaning of the words in question should be read into the statute is definitely held by the two cases cited by plaintiff in satisfying opinions.

In the Niewiadomski case the Court says: "The term 'in loco parentis,' according to its generally accepted common law meaning, refers to a person who has put himself in the situation of a lawful parent by assuming the obligations incident to the parental relation without going through the formalities necessary to legal adoption. It embodies the two ideas of assuming the parental status and discharging the parental duties. * * * It clearly embodies more than furnishing material help to a close relative who is in need. One may be willing to furnish needed assistance to such a relative, even over a definite period of time, without being willing at the same time to assume the legal obligation of parent. Due to the obligations and rights· that arise out of such a relationship, the assumption of such a relationship does not arise by chance, but is the result of intention." Page 686 of 159 F.2d.

In the Strauss case much the same language is used.

In determining whether the Fortins, or either of them, stood in loco parentis to the soldier, as that term is used in the Act, as construed by the two cases above mentioned which I follow, we have the following facts which I find from the evidence:

The elder Bourbeau, the plaintiff, was a laboring man, without means, who was barely able to support his family, occasionally calling on the authorities for help. When his wife died, in 1931, he had four children, all at home, David, who later became the soldier, being the youngest. After three or four months the father took his family to New Auburn and moved into a house where his mother lived, young David going to school soon afterward. The father managed to keep his family together for about a year when he had to break the circle, placing the eldest child in one place and the three youngest with his sister, Mrs. Fortin, one of the defendants, in the town of Lisbon, where they went to school. This situation continued for about another year. The plaintiff says that he paid his sister board for his three children. She doesn't remember receiving the money; but it is clear that some amounts were paid for board while the children were together at their aunt's. The elder brother of young David established that fact in his testimony. The important point is that the obligation to pay board for the three children was recognized. Mrs. Fortin herself was working in a mill nearby. Her husband was blind, deaf and unable to earn money.

The three children remained with the Fortins till the autumn of 1933 when the father took them to Auburn and boarded them, all together, with a Mrs. Pelletier. In May 1934 the father married again and took his three youngest children to live with him and their step-mother in Lewiston. From then until young David went to work in the Lisbon mill in 1939 he seems to have lived intermittently with his father in Lewiston and Auburn and his aunt in Lisbon.

The records of his school attendance show that in each of the years 1933, 1934, 1935, 1936, 1937 he went to school in Lewiston and Auburn with a total for those schools in those years of 400 days; and in Lisbon, while living with his aunt, during the years 1934, 1935, and 1937, a total of 489 days.

During those years and until the boy was nearly seventeen he spent more time with his aunt than with his father and step-mother. His aunt showed much affection for him (having no children of her own) and bought him clothes and other necessities, took him into her home, nursed him when ill, gave him good advice and I have no doubt did what she could to take the place of a mother. She was an affectionate and generous aunt to a motherless boy, but I find no evidence of an intention to assume the responsibilities of any other relationship or the existence of any situation which is not wholly explainable by and consistent with the blood relationship and affection that existed between the aunt and her nephew. I find nothing which indicates that either the father, the boy or his aunt had any idea that the usual parental relationship had been set aside or changed in its essential aspects.

The boy when a soldier wrote brief but equally affectionate letters to both his father and his aunt. He sent his aunt an $800 war bond, evidently recognizing some obligation there, but he made his insurance payable to his estate excluding his aunt.

There is nothing in the convincing testimony of young David's brothers and sisters which indicates that they were conscious of any difference in the relationship of any of the children to their father. It appears from the testimony of the elder son that the obligation of the father to pay for board at Mrs. Fortin's was recognized in the family. She herself testified that during one period she got welfare checks for boarding the boy from the City of Lewiston, the father's pauper residence.

Up to the time in 1939 when David went to work in the mill in Lisbon he was in frequent touch with his father when staying with his aunt. Even while working in Lisbon, David kept his clothes at his father's, according to his elder brother.

After about the middle of 1939 David became practically self-supporting, earning on the average nearly $600 per year. He lived with his aunt, near the mill in

Lisbon, she charging him $5 per week for his board. The way she put it was, "I know he was going to work, and he stayed at my home", and, again, "He was staying with me when he went in the army". The idea of a permanent residence or home at the aunt's—as one living with a parent—is lacking in the evidence and I believe was not entertained by any of the parties at the time. When David came to enter the army it was the father who was consulted and who went with his son to the recruiting office where his name was given as one to be notified in case of death.

The record is wholly devoid of evidence to support a claim that the defendant Alfred Fortin, at any time, stood in loco parentis to the soldier. The only mention of him in the testimony seems to be a suggestion that he was influential in getting the job for David in the mill in Lisbon when David was living with his father in Lewiston.

It should not be overlooked that this is not a case where the soldier designated an individual as the beneficiary of his insurance, raising the question whether his intention can be carried out by liberally construing the statute for that purpose, as seems to have been the case in Zazove v. United States. This is a case where the father as surviving parent is entitled to the insurance, unless the claimants show that they have displaced the father in the parental relationship with the intention of assuming its obligations.

There is ample evidence in the case of affection and generosity on the part of the aunt and that she did much for the boy that a mother would do; but that is not sufficient basis for finding that the father's rights and obligations were transferred to, or assumed by the aunt, or that any such change in the natural relationship of father and son was intended, or thought to have been made, by any one concerned.

■ My conclusion is that the defendants cannot be regarded as having stood in loco parentis to the soldier, as that term is used in the Act, and that their claim to the soldier's insurance is not justified. Judgment must be rendered for the plaintiff with costs.