### LEWIS et al. v. UNITED STATES et al.
#### Civ. A. No. 256–F.

United States District Court
N. D. West Virginia,
Fairmont Division.
May 29, 1952.

74

Herschel Rose, Jr., Fairmont, W. Va., and Linn Mapel Brannon, Weston, W. Va., for plaintiffs.

C. Lee Spillers, U. S. Atty., Wheeling, W. Va., and Howard Caplan, Asst. U. S. Atty., Clarksburg, W. Va., for U. S.

William G. Johnson, Clarksburg, W. Va., for Curtis Blankenship and Nina Blankenship.

Ronald A. Clapperton, Summersville, W. Va., for Theodore Fleming Lewis, non compos mentis, and Wallace Kincaid, committee of Theodore Fleming Lewis, non compos mentis.

WATKINS, District Judge.

The question to be decided in this case is who stood "in loco parentis" to Harvey Lewis, a 19-year-old serviceman who died June 19, 1944. The answer will determine who is entitled to collect the proceeds of his National Service Life Insurance in the amount of $10,000.

Harvey Lewis was born April 24, 1925, and entered upon active service in the Navy on December 10, 1943. He designated as principal beneficiary "Curtis Blankenship, in loco parentis". Curtis Blankenship was his brother-in-law. No contingent beneficiary was named. The insured was unmarried and without any children. He was survived by a father and three sisters.

Curtis Blankenship filed claim for the insurance benefits which claim was denied by the Veterans' Administration on the ground that the evidence was insufficient to show that Curtis Blankenship had stood in loco parentis to the insured at any time prior to his entry into the service for a period of at least one year, as required by Section 601 (f) of the National Service Life Insurance Act of 1940, as amended on July 11, 1942, Title 38 U.S.C.A. § 801(f), in full force and effect at the time of insured's death. Upon appeal the Board of Veterans' Appeals affirmed this determination. Since the named beneficiary was not then within the permitted class of beneficiaries, and since no contingent beneficiary was named, the Board of Veterans' Appeals held that the insurance became payable under the devolution provisions of the National Service Life Insurance Act of 1940, as amended, which provide that "if no widow, widower, or child" survives, payment will be made "to the parent or parents of the insured who last bore that relationship * * *" to him. Title 38 U.S.C.A. § 802(h) (3) (C). Definition of the term "parent" is contained in 38 U.S.C.A. § 801(f) as follows: "The terms 'parent', 'father', and 'mother' include a father * * * persons who have stood

in loco parentis to a member of the military or naval forces at any time prior to entry into actual service for a period of not less than one year, * * *."

It will be noted from the above provisions that a named beneficiary standing in loco parentis to the deceased for a minimum period of one year can qualify as in loco parentis to the deceased if this period of one year was at any time prior to the insured's entry into active service. The provisions of the devolution statute require of one not a named beneficiary to prove that he has not only stood in loco parentis to the deceased serviceman for a period of not less than one year prior to his entry into military service, but also that he was the person who last stood in this relationship to the serviceman for the required period of one year.

Okey Dwight Lewis and Nettie Lewis, the uncle and aunt of insured, also filed claim for the insurance, but their claim was denied by the Veterans' Administration because the evidence did not show that they were the last persons who stood in the relationship of parents to the serviceman for a period of at least one year prior to his entry into active service. The Board of Veterans' Appeals held that this finding was substantiated by the evidence and affirmed the Veterans' Administration. The Veterans' Administration was of the opinion that Theodore Fleming Lewis, the natural father of the serviceman, was the last person to stand in the relationship of parent for the required period and that he was entitled to the insurance.

■ Thereafter this action was brought by Okey Dwight Lewis and Nettie Lewis against the United States, whereupon Curtis Blankenship and Nina Blankenship, his wife, Theodore Fleming Lewis, non compos mentis, and Wallace Kincaid, Committee of Theodore Fleming Lewis, non compos mentis, were impleaded as party defendants. At the trial each of the claimants submitted evidence which was very much in dispute, much of the evidence of each claimant being contradicted by the evidence of some other claimant. It is therefore a case where the court must pass upon the credibility of witnesses and determine the facts. Before

doing that there are certain general principles of law which should be mentioned.

The phrase "in loco parentis" has been interpreted in the light of its common-law meaning by some courts while others have applied a more liberal concept. In the majority of cases the courts have followed the common-law concept. See Niewiadomski v. United States, 6 Cir., 159 F.2d 683; Leyerly v. United States, 10 Cir., 162 F.2d 79; Horsman v. United States, D.C.W.D.Mo., 68 F.Supp. 522; Richards v. United States, infra. The common-law meaning of this term has been defined as follows: "The term 'in loco parentis', according to its generally accepted common law meaning, refers to a person who has put himself in the situation of a lawful parent by assuming the obligations incident to the parental relation without going through the formalities necessary to legal adoption. It embodies the two ideas of assuming the parental status and discharging the parental duties." Niewiadomski v. United States, supra [159 F.2d 686]. To the same effect see Neuhard v. United States, D.C.M.D.Pa., 83 F.Supp. 911; Horsman v. United States, supra; Bearhart v. United States, D.C.Minn., 82 F. Supp. 652; Bourbeau v. United States, D.C. Me., 76 F.Supp. 778. In the Niewiadomski case the court stated: "A parent has the right to the custody and control of a minor child together with the authority to take such disciplinary measures as are reasonably necessary to discharge the parental duty. A parent who is providing a home for his minor son and supporting him is entitled to his services and earnings. The same rights and duties exist when the relationship of in loco parentis has been intentionally assumed and established." In the Leyerly case the court stated [162 F.2d 85]: "The relationship, as the term implies, is a standing in the place of, or instead of, a parent; one charged fictitiously with a parent's rights, duties and responsibilities." This court stated in Richards v. United States, infra, its adherence to the common-law definition of in loco parentis.

■ It must be borne in mind in passing on the claim of Curtis and Nina Blankenship that the National Service Life Insurance, being remedial in nature, should be

liberally construed to give full effect, insofar as possible, to the expressed intention of the insured, McClure v. United States, 9 Cir., 95 F.2d 744; Richards v. United States, D.C.N.D.W.Va., 93 F.Supp. 208; Zazove v. United States, 7 Cir., 156 F.2d 24; Meisner v. United States, D.C.W.D. Mo., 295 F. 866, and that Curtis Blankenship was designated as beneficiary in this insurance policy.

From 1927 until the latter part of 1935, the plaintiffs, Okey Dwight Lewis and Nettie Lewis, uncle and aunt of the insured, stood in loco parentis to him. The statement of Nettie Lewis to the effect that the father told her, "If I took Harvey I could keep him", coupled with the death of the boy's mother in 1927, the breaking up of the father's home, and the length of time the plaintiff cared for, fed, clothed and raised the boy leads only to that conclusion. One who avers the severance of the relationship of in loco parentis must bear the burden of proving it, since the law presumes the continuance of a status once shown to exist. Leyerly v. United States, supra; Young v. Hipple, 273 Pa. 439, 117 A. 185, 25 A.L.R. 1541. But this burden has been fully carried. The status of in loco parentis existing between plaintiffs and the boy was completely destroyed by events which followed, and that status was never again established.

In December, 1935, the boy's father, having remarried, came to plaintiffs' home and got him, and never again returned with him. When the boy left with his father in 1935, he was only ten years of age. From about December, 1935, until December, 1939, the evidence is clear that the boy did not live with plaintiffs, and they did not support him. Plaintiffs' claim that the boy was with them for a period of about 18 months beginning December, 1939, but there is strong evidence to the contrary. They did not support or care for the boy after 1941, when Nettie Lewis said he left their home taking most of his clothing with him to his father's, and was continually away thereafter except for a period of three weeks when he returned to do some work. While the plaintiffs have proved that they stood in the status of parents to the boy from 1927 until 1935, they have failed to show that they

were the last to be in loco parentis to him prior to his entry into service in 1943. Plaintiffs contend that if this relationship was interrupted by his departure in 1935, it was re-established in 1939. The evidence does not support this contention. During this interim the natural father once again assumed his parental obligations and exercised parental dominion over him and continued to do so until his entry into service.

Claimants Curtis Blankenship and Nina Blankenship base their claims to the insurance benefits upon two periods of time which they say put them in loco parentis to the insured, these periods being from the spring of 1935 until late in 1939, and from the spring of 1941 until Harvey entered the service. I find that Curtis and Nina Blankenship have failed to establish this relationship for either of these periods.

The testimony of Curtis Blankenship and his wife is conflicting as to the permanency of Harvey's stay at their home during the period 1935 to 1939. In reference to this period Curtis stated that the only time Harvey was away from his house during these four years was when he visited his father for about one month on one occasion. The testimony of his wife was to the effect that he spent "as much" time at their house as while he was away. On cross-examination, Nina Blankenship testified that she did not know where Harvey went to school from 1935 to 1939. It would seem that if the Blankenships kept him as much as they contend, they would know where he went to school during this period, or at least would know if he went to school at all.

Letters addressed to the Blankenships by the deceased after his entry into service contain enlightening evidence as to the actual relationship that existed between them. In these letters Harvey consistently used the salutation "Dear Sis & all" and "Hi Sis". In referring to claimant Curtis Blankenship, the deceased designated him as "Curt" and often used jovial and lighthearted phrases in mentioning him. In contrast, when on different occasions he mentioned his natural father, his reverence for him was evidenced by referring to him as "Dad". The deceased also disclosed his interpretation and understanding of the

status existing between himself and the Blankenships when, in one of his letters, he invited Nina Blankenship to spend money he was sending her if she needed it "because you all have (given) me ten times that much", by this statement showing that he regarded their relationship not as that of parent and child, but rather that of close relatives, one of whom furnished material assistance, the other feeling some obligation to repay it, at least in part. This same spirit is manifested when Harvey made out bonds to his sister, Nina Blankenship, while he was in the service.

During the period 1935 to June 1939 both Theodore Lewis and the Blankenships resided at Widen, West Virginia, Theodore Lewis moving then to Dill, West Virginia. It is evident that the deceased often visited at the home of the Blankenships and that there was a mutual fondness existing between them. Nina Blankenship was Harvey's oldest sister, she being eight years older than the deceased. Living in the same small community it was only natural that Harvey would visit the Blankenships often, sometimes undoubtedly extending these visits to lengthy stays, but always with the approval of the father. The necessity of this approval was evidenced by the testimony of Curtis Blankenship, who stated that Harvey's father would often come and take him from their home. Also showing the presence of Theodore Lewis' parental control over his son was the testimony of Curtis Blankenship concerning the period 1941 until Harvey's entry into service, when the witness stated that the father removed him from the witness' home to enroll him in school and that he voiced no objection because he was Harvey's father.

The evidence introduced in this case justifies a finding that the Blankenships did care for and support the deceased when he visited their home, and that these visits were probably frequent, but I find that at no time did the Blankenships intend to assume the responsibilities incident to parental relationship to the deceased. During all this time the parties respected the father's dominion and control over the deceased and in no way interfered when he exercised it. The true relationship between the deceased and the Blankenships was, as stated above, that of close relatives. The court, in Niewiadomski v. United States, supra, in discussing the meaning of the term in loco parentis said in part, "It clearly embodies more than furnishing material help to a close relative who is in need. One may be willing to furnish needed assistance to such a relative, even over an indefinite period of time, without being willing at the same time to assume the legal obligation of a parent. Due to the obligations and rights that arise out of such a relationship, the assumption of the relationship does not arise by chance, but is the result of intention. * * * The relationship is essentially different from the relationship of brother and sister, or the relationship of cousins, which relationships do not include the legal obligations existing between parent and child." [159 F.2d 686.]

It is also important to note the fact, in passing on the claim of the Blankenships, that only eight years separated the age of the insured and that of his sister Nina Blankenship, and but eleven years the age of Curtis Blankenship and the insured. Although the relative ages of the person supposedly standing in the position of in loco parentis and the "child" is not controlling to the existence of this relationship, it may be noted that it does have value in helping to ascertain the true status existing between the parties.

There is much dispute in the evidence as to the whereabouts of the boy after he left the Okey Dwight Lewis home in 1935. There are times thereafter when all three claimants to the insurance say that he was living with them. After observing the demeanor of the various witnesses, their bias or interest in the outcome of the trial, if any, and their opportunity of knowing the facts, I make the following findings of fact:

After the father remarried in 1935 and re-established a home, he immediately took the boy, and the boy lived with the father and step-mother at Widen, W. Va., until June, 1939. They then moved to Dill, W. Va., where the son lived with them. In November, 1939, the father, Theodore Fleming Lewis, was adjudicated a mental incompetent and admitted to the Spencer State Hospital, Spencer, W. Va., a mental institution,

where he was a patient for one year. Before his commitment to that institution he made arrangements for Harvey's care and custody while he was to be away with his step-son Casey Jones and Mrs. Jones, financial expediencies forcing the step-mother to seek employment. It was at this time that the boy returned to the home of plaintiffs, which return plaintiffs contend revived their parental status. After a very short stay with plaintiffs, the boy returned to the Jones home obtained for him by his father, going to school with other children in that household. The father was released to the custody of a brother in November, 1940, and was administratively discharged in November, 1941. Upon leaving the hospital in November, 1940, he stayed at the home of Curtis Blankenship for a period of about two months, the boy being there periodically with him. In the spring of 1941, Harvey, now almost 16, proceeded with his father to a locale named the "Ford McLaughlin Place" and "batched" with him there while both were employed as farm help, they being later joined by Mrs. Lewis. The family, including Harvey, then moved to "Starcher's Camp" a few miles below Widen, where the father was employed cutting timber. In the fall of 1941 the father obtained employment cutting timber at what was called "Mollohan Place", and he then secured a temporary home for Harvey with Mary Cruckshank until he could get settled at this new location, this separation lasting only about two months. The father and Harvey lived at the "Mollohan Place" until the son entered service in 1943, the boy doing odd jobs while his father was employed there. These events established a parental relationship between the insured and his father, which relationship continued up until the boy's death in 1944. During the period from 1935 when he took his ten-year-old son from the Okey Dwight Lewis home until the boy entered the service in 1943, the father assumed and discharged the obligations and responsibilities inherent in the relationship. In discharging his parental duties the evidence shows that the father supported his son to the best of his ability under all the circumstances. The father was not well, but worked as much as his health and strength would permit. He was frail and small of stature. He had six children. Since he was not educated and not a skilled workman, he had to get such employment on odd jobs as his strength and health would permit. Of necessity, he had to move from one community to another quite frequently. This is no doubt the reason that when Harvey registered for draft he used the Blankenship address, and had his civilian clothes returned to the same address. Under these circumstances the father's earnings were not large and undoubtedly there was much to be desired in his home in comforts, if not in necessities of life. But at no time did he fail to recognize his parental obligation to this son and do the best he could to discharge those duties. This is clearly shown by the arrangements he made for the care and custody of his son while he was in the mental hospital and until such time as he could once again assume those duties. It is shown again in the fall of 1941 when the father secured a temporary home for his son with the Cruckshanks for a period of two months until the father could get located at his new place of employment. Although he had suffered at one time from mental trouble, the father testified at the trial and made a splendid impression. His memory was good and his recollection was generally in accord with known facts. He gave the impression that he intended to tell the truth without regard to the disposition of the money in the case.

Claimants Okey Dwight Lewis and Nettie Lewis and Theodore Fleming Lewis say that the claim of Curtis Blankenship and Nina Blankenship is barred by limitations. With this contention I am unable to agree.

For the reasons stated above, the father, Theodore Fleming Lewis, or his representative, is entitled to receive the proceeds of this insurance policy, after the payment of a reasonable attorney fee to his attorney as provided by statute.